IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **JOHN ANDREW KISTER,** <br> **#264274,** <br><br> **Plaintiff,** <br><br> v. <br><br> **DR. BRADFORD, et al.,** <br><br> **Defendants.** | ) <br> ) <br> ) <br> ) <br> ) <br> )   Case No. 2:20-cv-828-CWB <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OPINION AND ORDER**

**I.      Procedural Background**

Plaintiff John Andrew Kister, acting *pro se*, initiated this action under 42 U.S.C. § 1983. (Doc. 1).  Kister has named Optometrist Dr. Bradford, Bullock Medical Director Dr. Siddiq, and Alabama Department of Corrections ("ADOC") Associate Commissioner Ruth Naglich as defendants (*see* Docs. 1, 7, & 8) on the allegation that his Eighth Amendment rights were violated when Dr. Bradford performed "a cursory exam of [his] eyes" and wrote him an inadequate prescription for eyeglasses (Doc. 1 at pp. 3 & 4).  For relief, Kister requests monetary damages and to be sent "to an eye doctor other than Dr. Bradford to do a complete exam for glasses and [his] right eye issues." (*Id*. at p. 5).

On October 27, 2020, the court issued an Order directing the defendants to file written reports addressing Kister's claims.  (Doc. 10).  Dr. Siddiq filed a Special Report on November 11, 2020 (Doc. 15); Ruth Naglich filed a Special Report on December 9, 2020 (Doc. 23); and Dr. Bradford filed a Special Report on February 2, 2021 (Doc. 40).  Each of the defendants requested summary judgment and provided the court with various supporting evidentiary materials (Docs. 15-1 through 15-4; Docs. 23-1 through 23-2; Docs. 40-1 through

40-2). Dr. Siddiq later filed a Supplemental Declaration (Doc. 32), and Dr. Bradford filed a Supplemental Special Report with additional evidentiary materials (Docs. 47 through 47-2).

The court then directed Kister to file a response to the defendants' filings and to support the response with affidavits or statements made under penalty of perjury and/or other evidentiary materials. (Doc. 48).  Kister in turn filed numerous submissions.  (Docs. 25, 26, 27, 35, 45, 50, 51, 52, 53, 54, & 55).  The defendants subsequently submitted certain additional evidentiary materials. (Doc. 58).

The parties have been given notice that "the court may at any time [after expiration of the time for Kister to file a response] and without further notice to the parties (1) treat the special reports, supplements thereto[,] and any supporting evidentiary materials filed by the defendants as motions for summary judgment, and (2) after considering any response as allowed by this order, rule on the dispositive motions in accordance with the law."  (Doc. 48 at p. 3).  Pursuant to that disclosure, the undersigned will now treat the defendants' Special Reports and supplements as having presented arguments for summary judgment and will conclude that summary judgment is due to be granted in the defendants' favor on all claims.

## II.     Summary Judgment Standard

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party …. [A fact] is 'material' if it might affect the outcome of the case under the governing law."  *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citation omitted).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id*. Alternatively, a movant who does not have a trial burden of production can simply assert that the nonmoving party "cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. … [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). Under either scenario, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exists as to each element of the underlying claims. *See Celotex Corp.*, 477 U.S. at 324; Fed. R. Civ. P. 56(c)(1)(A).

To establish a genuine dispute of material fact, the nonmoving party must produce such evidence as would be sufficient for a reasonable trier of fact to return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). When evaluating whether a genuine dispute of material fact exists, the court must view all of the evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant's favor. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see also* Fed. R. Civ. P. 56(a). Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant is not relieved from the burden of demonstrating a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).

**III.    Relevant Facts**[1]

The verified Complaint sets out the core facts as follows:

1. I am in the Residential Treatment Unit at Bullock Corr. Facility ("BCF").

2. The Alabama Dept. of Corrections contracts with area specialists to see prisoners at each prison.

3. For eye care, the contracted doctor at BCF is Dr. Bradford.

4. After months of delay, I saw Dr. Bradford here at BCF September 21, 2020.

5. I saw him to correct faulty glasses he gave me in March 2020.

6. I am also having blurry vision and a red [] splotch in my right eye field of vision.

7. I tried to bring up my right eye issues, but my complaints were ignored by Dr. Bradford, who also called me a liar twice.

8. He only did a cursory exam of my eyes.

(Doc. 1 at p. 4). In sworn declarations attached to their respective Special Reports, Dr. Bradford, Dr. Siddiq, and Associate Commissioner Naglich counter with the averments set out below.

---

[1] The facts as set out herein are derived from the verified Complaint (Doc. 1), the sworn evidentiary materials provided by the defendants (Docs. 15-1 through 15-4; Docs. 23-1 through 23-2; Doc. 32; Docs. 40-1 through 40-2; Doc. 47; Doc. 58), and Plaintiff's verified filings in response (Docs. 25-1 through 25-5; Doc. 52; Doc. 54). Although Kister submitted additional filings (Docs. 25, 26, 27, 35, 45, 50, 51, 53, & 55), they were neither sworn nor verified in accordance with 28 U.S.C. § 1746 and thus cannot be considered. *See, e.g., Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) ("Unsworn statements may not be considered by a district court in evaluating a motion for summary judgment.") (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003)). As such, what are deemed facts at this stage are merely for purposes of resolving summary judgment and may not constitute the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) ("[W]hat we state as 'facts' … for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.").

Dr. Bradford first evaluated Kister at Elmore Correctional Facility on March 11, 2020. (Doc. 47-2 at p. 4, ¶ 7). Dr. Bradford performed a full dilated eye exam, using an auto-refractor and indirect ophthalmoscope, and determined that Kister was near-sighted with an astigmatism. (*Id*.). Dr. Bradford ordered prescription eyeglasses for Kister based upon his examination. (*Id*.). The prescription was: OD -3.75 075 x 003; OS -2.75 075 176 with bifocals. (*Id*.). During the examination, Dr. Bradford also checked Kister's intraocular pressure using a tonometer, and he found that Kister's intraocular pressure was within normal limits. (*Id*. at ¶ 8). Dr. Bradford thereafter was not permitted entry into any Alabama state correctional facility due to COVID-19 restrictions until being permitted to return for a brief period in the late summer/early fall of 2020. (*Id*.).

On September 21, 2020, Kister again saw Dr. Bradford at Bullock Correctional Facility with complaints of eye problems and needing new eyeglasses. (*Id*. at p. 4, ¶ 10). Dr. Bradford again performed a full dilated eye exam using an auto-refractor and an indirect ophthalmoscope and ordered prescription eyeglasses for Kister. (*Id*.). The prescription was: OD -3.50 100 x 178; OS -2.25 100 167 with bifocals. (*Id*.). Dr. Bradford again checked Kister's intraocular pressure using a tonometer and again found that Kister's intraocular pressure was within normal limits. (*Id*. at p. 5, ¶ 11). Dr. Bradford did not note any red splotch in Plaintiff's vision, which would have been indicative of blood in the eye. (*Id.* at ¶ 12).

Kister received the second set of prescribed eyeglasses on October 2, 2020. (Doc. 15-1 at p. 3; *see also* Doc. 15-2 at p. 1). Upon receipt of his new eyeglasses, Kister informed the medical staff at Bullock Correctional Facility that the eyeglasses did not help. (Doc. 15-1 at p. 3). Kister further stated that he was not satisfied with the services performed by Dr. Bradford. (*Id*.). Accordingly, an appointment was scheduled for Kister in Dothan, Alabama (*Id*.), and Kister

was seen at Eye Center South on December 14, 2020. (Doc. 32-1 at p. 3; Doc. 32-2 at p. 1). Eye Center South recommended that Kister undergo a cataract evaluation in six months. (*Id*.). However, no further evaluation or treatment was recommended. (*Id*.). Kister promptly was scheduled for the recommended appointment. (*Id*.).

On September 22, 2020, Kister filled out an inmate grievance form to assert the following allegations:

> I saw Dr. Bradford, the eye doctor, September 21, 2020. He was very rude to me, calling me a liar twice: once when I told him I could not see out of the glasses he made for me in March 2020; and again when I told him I gave those glasses back to a nurse in the RTU. He also ignored me when I told him of issues with my right eye—blurry vision and a red "splotch" I can see; doing only a cursory exam. The exam for my glasses also seemed incomplete—especially the bifocal part. I need to see an eye doctor who will do a complete exam of my right eye, and of my sight for glasses with bifocals.

(Doc. 58 at p. 6). Kister subsequently filed an inmate grievance appeal on October 9, 2020:

> I feel this is an urgent issue. My right eye symptoms have been going on for months. I need to be sent out to an eye doctor who will do a thorough exam on my right eye; and a thorough exam for my glasses and bifocals. Someone other than Dr. Bradford who has now (intentionally) made me 2 pair of glasses I cannot see properly out of.

(*Id*. at p. 7).

Kister also submitted several Sick Call Request forms. The first, dated October 2, 2020, states: "I received a pair of glasses today. I cannot see properly out of them. This was Dr. Bradford's second attempt to prescribe me glasses. They are not strong enough, and neither are the bifocals. I need to see another eye doctor." (Doc. 25-4). The second, dated October 24, 2020, states: "I am still having problems. 2 successive pair of glasses made by Dr. Bradford I cannot properly see out of. Plus my right eye is blurry and I can see a red "splotch!" I need to see a provider—not Dr. Bradford." (Doc. 25-5). The third, dated December 21, 2020, states: "I need to see Dr. Siddiq. I need glasses! Dr. Bradford has twice made me glasses I cannot

6

see out of properly. I need to see someone who can properly make me glasses I can see with—someone other than Dr. Bradford." (Doc. 52-1). The fourth, dated January 15, 2021, states: "I need glasses! (That I can see out of—been trying to get some for almost a year)." (Doc. 52-2). And the fifth, dated January 16, 2021, states: "I need glasses still, please, I can't see very well out of the ones I have (couldn't make yesterday sick call, was sick to stomache [sic]." (Doc. 52-3).

Finally, in a declaration submitted in response to the defendants' filings, Kister additionally avers as follows:

1. I wear eyeglasses.

2. I requested new glasses because the glasses I currently have are 7 years old and I cannot see properly out of them anymore.

3. I saw Dr. Bradford in March of 2020. He made me a prescription for eyeglasses.

4. I could not properly see out of the glasses that were made.

5. I again saw Dr. Bradford in September of 2020, after months of delay, to correct the prescription given to me in March 2020.

6. He again wrote me a prescription, and again I could not properly see out of the glasses.

7. When I told Dr. Bradford about blurry vision and a red splotch in my right eye, he ignored me.

8. When I told him I could not properly see out of the pair of glasses made from his first prescription, he called me a liar.

9. Dr. Bradford was deliberately indifferent to my serious medical needs.

10. Ruth Naglich is responsible for contracting with vendors for our healthcare needs.

11. She contracted with Wexford Health Sources, who in turn contracted with Dr. Bradford.

12. She is accountable for the deliberate indifference of Dr. Bradford.

7

13. I have been at Bullock Correctional Facility since July 20, 2020.

14. Dr. Tahir Siddiq is the medical doctor here.

15. As of the date of this document, I still do not have new glasses.

16. Dr. Siddiq is accountable to ensure I have adequate health care.

17. Going several months without proper eye glasses is inadequate care.

18. Dr. Siddiq is aware I need new glasses. He has failed to procure me an appointment with a doctor capable of prescribing glasses I can see out of.

19. He is deliberately indifferent to my eye care needs, as far as glasses are concerned.

20. Dr. Siddiq did send me to Eye Center South in response to my complaint of blurry vision and a red splotch in my right eye.

21. However, he did not request or order an eye exam for glasses, so none was done.

22. This with the knowledge that I need new glasses; and that Dr. Bradford had written 2 failed prescriptions for glasses.

23. Dr. Siddiq was deliberately indifferent to my serious medical need of new glasses.

(Doc. 54 at pp. 1-2; *see also* Doc. 35: acknowledging examination by Dothan Eye Clinic but complaining about lack of new glasses). Kister remained without new eyeglasses as of February 2021. (Doc. 52).[2]

### IV. Discussion

**A. The court must narrowly construe Kister's present claims so as to avoid duplicative litigation.**

"An action may be dismissed as malicious or frivolous if it duplicates claims raised by the same plaintiff in previous or pending litigation." *Bagby v. Karriker*, 555 F. App'x 405, 406

---

[2] The record is silent as to whether Kister ultimately received eyeglasses that were to his satisfaction.

(5th Cir. 2014) (citations omitted) (affirming the dismissal of a complaint as malicious and frivolous because it was duplicative of a prior action, as "[t]he two suits raised similar claims that fairly may be viewed as arising 'from the same series of events'").[3]  Here, it appears that Kister previously filed similar claims against Dr. Siddiq and Associate Commissioner Naglich regarding the same subject matter as the claims at issue in this case.  *See Kister v. Naglich, et al.*, No. 2:20-cv-758-WKW-CSC (M.D. Ala. 2020).  Kister contends, however, that his prior "similar case" was "about delay of months to see eye doctor," while the present case "is about the doctor who finally saw [him] being deliberate[ly] indifferent."  (Doc. 1 at p. 1).

Although the present case fairly could be said to arise "from the same series of events" addressed in Kister's previous case, *see Bagby*, 555 F. App'x at 406, and "alleg[es] many of the same facts," *see Bailey*, 846 F.2d at 1021, considering Kister's status as a *pro se* litigant and his assertion that he is not seeking to bring duplicative claims in this case, the court will consider Kister's present claims but will narrowly construe Kister's allegations as purporting to state claims based upon the <u>adequacy</u>, rather than the <u>timeliness</u>, of the treatment he received.

---

[3] *See also Bailey v. Johnson*, 846 F.2d 1019, 1021 (5th Cir. 1988) (finding that district court did not abuse its discretion in dismissing an action as duplicative of prior litigation containing the same claims but against different defendants and noting that "we have dismissed an appeal as frivolous because it involved a duplicative action arising from the same series of events and alleging many of the same facts as an earlier suit, concluding that '[r]epetitious litigation of virtually identical causes of action is subject to dismissal under 28 U.S.C. § 1915(d) as malicious'") (citation omitted); *Cato v. United States*, 70 F.3d 1103, 1105 n.2 (9th Cir. 1995) ("There is no abuse of discretion where a district court dismisses under § 1915(d) a complaint 'that merely repeats pending or previously litigated claims.'") (citation omitted); *Perry v. Culliver*, No. 12-231, 2012 WL 1994917, *2 (S.D. Ala. Apr. 23, 2012) (dismissing a duplicative action as malicious when the same allegations were made but against different defendants).

> **B.  Kister has failed to present a genuine dispute of material fact on his claim for deliberate indifference.**

"The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  In order to establish "deliberate indifference to [a] serious medical need ..., [a p]laintiff[] must show: (1) a serious medical need; (2) the defendant['s] deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).  The standard consists of both objective and subjective components. *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (explaining that an inmate is required to show "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts"); *see also Keohane v. Florida Dept. of Corrs. Sec.*, 952 F.3d 1257, 1266 (11th Cir. 2020) ("A prisoner bringing a deliberate-indifference claim has a steep hill to climb.").  Kister asserts that the defendants acted with deliberate indifference via the allegedly "cursory" examination performed by Dr. Bradford.

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)).  "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." *Id.* (quotation marks and citation omitted); *Taylor*, 221 F.3d at 1258.

Although an unconstitutional level of "deliberate indifference" does not require a showing that the defendant acted purposefully to cause harm, it clearly does involve something beyond

10

mere negligent conduct. *Chandler v. Crosby,* 379 F.3d 1278, 1289-90 (11th Cir. 2004).[4] Accordingly, a plaintiff must show "an objectively 'serious medical need[]' ... and second, that the response made by [the defendant] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted); *see also Daniels v. Williams*, 474 U.S. 327, 330-33 (1986) ("The facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment."). Stated differently, "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Farrow*, 320 F.3d at 1245. Nothing in the record would support such findings.

### i. Associate Commissioner Naglich

Kister has presented no facts to support his claim that Naglich acted with deliberate indifference toward his medical needs. It instead appears that Naglich was named as a defendant solely upon her position as Associate Commissioner for the Alabama Department of Corrections. There is nothing in the record to suggest that Naglich had personal familiarity with Kister's medical needs, had involvement with decisions regarding his medical treatment, impeded his access to medical care, or attempted to intercede, overrule, or influence any decisions made by medical personnel. Absent such evidence, Kister simply cannot hold Naglich liable for the acts or omissions of medical professionals:

---

[4] Whether the proper standard is "more than mere negligence" or "more than gross negligence" is currently up for debate. *See Wade v. McDade*, 67 F.4th 1363, 1371-72 (11th Cir. 2023), *reh'g en banc granted*, *opinion vacated sub nom. Wade v. Ga. Corr. Health, LLC*, 83 F.4th 1332 (11th Cir. 2023). To err on the side of caution, the "more than mere negligence" standard will be applied in this instance.

> The law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.*, 198 Fed. Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007); *see also Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (absent a reason to believe, or actual knowledge, that medical staff is administering inadequate medical care, non-medical prison personnel are not chargeable with the Eighth Amendment scienter requirement of deliberate indifference).

The law indeed is well settled that liability in a § 1983 action may not be based upon theories of *respondeat superior* or vicarious liability. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (stating that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*"); *see also Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability"), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010); *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1028-29 (11th Cir. 2001) (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim"), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding that supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (holding that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory

officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability).

Liability can attach to supervisory personnel only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions … and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360; *see also Iqbal*, 556 U.S. at 677 ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). To establish a causal connection without direct participation, a plaintiff must present sufficient evidence of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a … custom or policy [that] result[ed] in deliberate indifference to constitutional rights, or ... facts [that] support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). After extensive review of the pleadings and evidentiary materials, the undersigned concludes that Kister has failed to present any evidence in that regard.[5]

### ii. Dr. Bradford

The record is undisputed that Kister was first examined by Dr. Bradford in March 2020 with complaints that his pre-existing pair of glasses were outdated. (Doc. 47-2 at p. 4, ¶ 7).

---

[5] Even if a genuine issue of fact existed as to whether Naglich acted with deliberate indifference, she nonetheless would be entitled to sovereign immunity to the extent she is being sued for monetary damages in her official capacity. *See Kister v. Naglich*, No. 2:20-cv-758-CSC, 2023 WL 4036146, *3 (M.D. Ala. June 15, 2023) ("[T]o the extent Kister sues the correctional defendants in their official capacities, as state actors, they are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages.") (citations omitted). Not only that, Naglich additionally would be entitled to qualified immunity to the extent she is being sued for monetary damages in her individual capacity. *Id*. at *4-7 (holding that Naglich was protected by qualified immunity as to a virtually identical claim brought by Kister).

It additionally is undisputed that Dr. Bradford issued Kister a new prescription at that time (*Id*.) and that Kister received replacement glasses (Doc. 1 at p. 4). It further is undisputed that Kister was seen again by Dr. Bradford in September 2020 due to dissatisfaction with his new glasses and that after a second examination Dr. Bradford issued Kister yet another updated prescription (Doc. 47-2 at pp. 4-5, ¶ 10). Kister acknowledges that he received new glasses but asserts that they were too weak. (Doc. 54).

Given that Kister at all times possessed a preexisting pair of glasses he had utilized for a number of years, and given that the evidence reflects those glasses provided "visual acuities of 20/30 in the right eye and 20/40 in the left eye," the undersigned cannot conclude on the current record that Kister has presented a genuine issue of material fact as to whether he was facing an objectively serious medical need when seen by Dr. Bradley or that Dr. Bradley responded in an objectively unreasonable manner. *See Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (stating that only medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" violates the Eighth Amendment) (quotation marks and citation omitted); *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) ("With respect to prisoners' medical care … we have held that the Eighth Amendment doesn't require it to be 'perfect, the best obtainable, or even very good.'") (citation omitted).

The record likewise fails to reflect a genuine issue of material fact on the subjective prong. The evidence is undisputed that Dr. Bradford evaluated Kister's vision twice, performed standard examinations to assess Kister's vision needs, and prescribed glasses to address Kister's vision impairments. There is nothing in the record to suggest that Dr. Bradford had subjective knowledge that the prescribed glasses would place Kister at risk of serious harm and/or that he disregarded

14

such a risk. *See Farrow*, 320 F.3d at 1245. Moreover, the record demonstrates that Dr. Bradford did not note any red splotch during his examinations that he believed to warrant treatment. Although Kister asserts that the glasses he was prescribed were not strong enough and that his complaints regarding a red splotch were ignored, any such potential deficiencies cannot under the circumstances be deemed anything more than negligence and would not rise to the level of "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505; *see also Adams v. Poag,* 61 F.3d 1537, 1545-46 (11th Cir.1995) (explaining that whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment"); *Estelle*, 429 U.S. 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

### iii. Dr. Siddiq

With respect to Kister's claims against Dr. Siddiq, the undisputed evidence demonstrates that Dr. Siddiq responded to Kister's continued complaints about Dr. Bradford's treatment of his vision—including the effectiveness of his two pairs of replacement glasses—by referring Kister to a third-party provider. (Doc. 32-1 at p. 3; Doc. 32-2 at p. 1). Therefore, even if Kister arguably could show the existence of a serious medical need during the relevant period, he still has failed to present a genuine issue of material fact as to whether Dr. Siddiq responded in an objectively unreasonable manner. The undisputed evidence likewise demonstrates that Dr. Siddiq further arranged for Kister to undergo a cataract evaluation as recommended by that provider. (Doc. 32-1 at p. 3). Under the totality of circumstances, the court concludes that Kister has failed

to present a genuine dispute of material fact that Dr. Siddiq had subjective knowledge of any risk of serious harm or that Dr. Siddiq disregarded such a risk.  *See Farrow*, 320 F.3d at 1245; *see also Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th. Cir. 1996) ("There is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not ... .'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)); *see also Campbell*, 169 F.3d at 1370.  In any event, given Dr. Siddiq's actions in arranging outside medical care, his other actions/inactions could not be deemed anything more than mere negligence. *See Williams v. Arnold*, 207 F. App'x 980, 985 (11th Cir. 2006).

## V.     Conclusion

Based on the foregoing, Kister has failed to submit sufficient evidence to create a triable issue of fact on claims that one or more of the defendants violated his Eighth Amendment rights. It therefore is **ORDERED** that the defendants' construed motions for summary judgment (Docs. 15, 23, & 40) are **GRANTED**.  A final judgment will be entered separately.

**DONE** this the 15th day of March 2024.

_____
CHAD W. BRYAN
UNITED STATES MAGISTRATE JUDGE